IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| CARMEN HINOJOSA, Individually and as | § | |
| NEXT FRIEND of HECTOR JILPAS, an | § | |
| Incapacitated Person, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. 7:14-cv-324 |
| | § | |
| METROPOLITAN LIFE INSURANCE | § | |
| COMPANY, et al., | § | |
| | § | |
| Defendants. | § | |

**THE METLIFE DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF**

Andrew C. Whitaker
State Bar No. 21273600
FIGARI & DAVENPORT, L.L.P.
901 Main Street, Suite 3400
Dallas, Texas 75202
(214) 939-2000
(214) 939-2090 (telecopy)

R. Patrick Rodriguez
State Bar No. 24002861
ATLAS, HALL & RODRIGUEZ, L.L.P.
50 W. Morrison Road, Suite A
Brownsville, Texas 78520
(956) 574-9333
(956) 574-9337 (telecopy)

ATTORNEYS FOR DEFENDANTS
METROPOLITAN LIFE INSURANCE
COMPANY, METROPOLITAN TOWER LIFE
INSURANCE COMPANY, METROPOLITAN
INSURANCE AND ANNUITY COMPANY,
AND METLIFE INSURANCE COMPANY OF
CONNECTICUT

## TABLE OF CONTENTS

SUMMARY ....................................................................................................................1

STATEMENT OF UNDISPUTED FACTS ...............................................................2

    A.    Hinojosa Files the Underlying Action ...................................................2

    B.    Hinojosa Considers Both a Term Certain and a
          Lifetime Payment Stream ........................................................................3

    C.    Hinojosa Accepts the 20-Year Certain Quote.........................................5

    D.    The Guardian Ad Litem Inquires About a Payment
          Stream With a Higher Monthly Benefit, Which MetLife
          Generates but Is Not Accepted ...............................................................6

    E.    Hinojosa, Dr. Caballero, and the JUA Sign the Settlement Agreement .................7

    F.    The Trial Court Signs the Judgment .......................................................8

    G.    MetLife Receives the Application, Which Calls for a 20-Year
          Certain Payment Stream Starting at $1,929.43 Per Month....................8

    H.    The JUA (Through St. Paul) Signs the Original UQA, Which Calls for
          a 20-Year Certain Payment Stream Starting at $1,929.43 Per Month...................9

    I.    Tailored Awards Prepares the Erroneous UQA, Which Provides
          in Error for Lifetime Benefits Starting at $1,929.43 Per Month............9

    J.    The Erroneous UQA Limits MetLife's Payment Obligations
          to the Payment Obligations of Dr. Caballero and the JUA...................12

    K.    The Certificate Limits MetLife's Payment
          Obligations to the Actual Amount of Premium Paid ...........................13

    L.    MetLife Pays Full Monthly Benefits, Starting at
          $1,929.43 Per Month, to Hinojosa for Twenty Years...........................14

ARGUMENT AND AUTHORITIES.......................................................................15

    A.    MTLIC and MetLife Are Entitled to Summary Judgment on
          Their Counterclaims for Reformation and Declaratory Relief .............15

    B.    The MetLife Defendants Are Entitled to Summary
          Judgment on Hinojosa's Claim for Breach of Contract.......................26

    C.    The MetLife Defendants Are Entitled to
          Summary Judgment on Hinojosa's Fraud Claim .................................28

D.   The MetLife Defendants Are Entitled to
Summary Judgment on Hinojosa's Claims for Bad Faith and
Violations of the Texas Insurance Code and DTPA ...............................................30

E.   The MetLife Defendants Are Entitled to Summary
Judgment on Hinojosa's Claim for Future Benefits ...............................................33

CONCLUSION ...............................................................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ace Drug Marts, Inc. v. Sterling*,
    502 S.W.2d 935 (Tex. Civ. App.--Corpus Christi 1973, writ ref'd n.r.e.)............20, 22, 23, 24

*Aetna Life Ins. Co. v. Swain*,
    148 S.W.2d 921 (Tex. Civ. App.--Galveston 1941, no writ)...................................34

*Automobile Ins. Co. of Hartford, Conn. v. United Elec. Service Co.*,
    275 S.W.2d 833 (Tex. App.--Fort Worth 1955, writ ref'd n.r.e.)...........................20

*Avila v. Loya*,
    No. 07-04-0096-CV, 2005 WL 1902120 (Tex. App.--Amarillo Aug. 10, 2005, no
    pet.) ...............................................................................................................33

*Bartlett v. American Republic Ins. Co.*,
    845 S.W.2d 342 (Tex. App.--Dallas 1992, no writ) ...............................................32

*Best Auto v. Autohaus, LLC*,
    339 S.W.3d 372 (Tex. App.--Dallas 2011, no pet.) ...............................................29

*Bridgmon v. Array Systems Corp.*,
    325 F.3d 572 (5th Cir. 2003) ............................................................................26

*Brinker v. Wobaco Trust Ltd.*,
    610 S.W.2d 160 (Tex. Civ. App.--Texarkana 1980, writ ref'd n.r.e.) .................15, 16, 23, 24

*Cambridge Cos., Inc. v. Williams*,
    602 S.W.2d 306 (Tex. Civ. App.--Texarkana 1980), *aff'd*, 615 S.W.2d 172 (Tex.
    1981) .........................................................................................................22, 23

*Capitan Enterprises, Inc. v. Jackson*,
    903 S.W.2d 772 (Tex. App.--El Paso 1994, writ denied)...................................27, 28

*Davis v. Grammer*,
    750 S.W.2d 766 (Tex. 1988)..........................................................................15, 19

*DeSantis v. Wackenhut Corp.*,
    793 S.W.2d 670 (Tex. 1990), *cert. denied*, 498 U.S. 1048 (1991) .........................28

*Dupree v. Gulf Oil Corp.*,
    328 F. Supp. 480 (E.D. Tex. 1971)....................................................................34

*Farnham v. Electrolux Home Care Products, Ltd.*,
    527 F. Supp. 2d 584 (W.D. Tex. 2007)...............................................................29

*First Nat'l Bank of Andrews v. Jones*,
    635 S.W.2d 950 (Tex. App.--Eastland 1982, writ ref'd n.r.e.) ...............................................19

*Givens v. Ward*,
    272 S.W.3d 63 (Tex. App.--Waco 2008, no pet.) ....................................................19

*Griggs v. State Farm Lloyds*,
    181 F.3d 694 (5th Cir. 1999) ..........................................................26

*Hamberlin v. Longview Bank & Trust Co.*,
    770 S.W.2d 12 (Tex. App.--Texarkana 1989, writ denied) .............................................19, 24

*Harville Rose Service v. Kellogg Co.*,
    448 F.2d 1346 (5th Cir. 1971), *cert. denied*, 405 U.S. 987 (1972).........................................23

*Hatch v. Williams*,
    110 S.W.3d 516 (Tex. App.--Waco 2003, no pet.)...............................................19

*Higginbotham v. State Farm Mut. Auto. Ins. Co.*,
    103 F.3d 456 (5th Cir. 1997) ..........................................................31

*Hill v. Spencer & Son, Inc.*,
    973 S.W.2d 772 (Tex. App.--Texarkana 1998, no pet.) ...........................................20

*JSC Neftegas-Impex v. Citibank, N.A.*,
    365 S.W.3d 387 (Tex. App.--Houston [1st Dist.] 2011, pet. denied) .....................................30

*Kansa Reinsurance Co. v. Congressional Mortg. Corp. of Texas*,
    20 F.3d 1362 (5th Cir. 1994) ..........................................................28

*Koral Indus. v. Security-Connecticut Life Ins. Co.*,
    802 S.W.2d 650 (Tex. 1990) (per curiam)............................................32

*Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*,
    739 F.3d 848 (5th Cir. 2014) .......................................15, 16, 19, 20, 21

*Lyons v. Millers Cas. Ins. Co. of Texas*,
    866 S.W.2d 597 (Tex. 1993)............................................31

*M-I LLC v. Stelly*,
    733 F. Supp. 2d 759 (S.D. Tex. 2010) .....................................28

*Marcuz v. Marcuz*,
    857 S.W.2d 623 (Tex. App.--Houston [1st Dist.] 1993, no writ) ........................................23

*McCarty v. Montgomery*,
    290 S.W.3d 525 (Tex. App.--Eastland 2009, pet. denied)...................................29

*McIntyre v. Armed Forces Benefit Ass'n*,
    27 S.W.3d 85 (Tex. App.--San Antonio, no pet.) ...............................................31

*McKenna v. Caldwell*,
   387 S.W.3d 830 (Tex. App.--Eastland 2012, no pet.) ............................................................8

*McKenzie v. Farr*,
   541 S.W.2d 879 (Tex. Civ. App.--Beaumont 1976, writ ref'd n.r.e.)....................................33

*McLaren v. Imperial Cas. & Indem. Co.*,
   767 F. Supp. 1364 (N.D. Tex. 1991), *aff'd*, 968 F.2d 17 (5th Cir. 1992), *cert. denied*,
   507 U.S. 915 (1993)................................................................................................................32

*New Braunfels Factory Outlet Center, Inc. v. IHOP Realty Corp.*,
   872 S.W.2d 303 (Tex. App.--Austin 1994, no writ)..............................................................24

*Olvey v. Jones*,
   156 S.W.2d 977 (Tex. 1941)...................................................................................................23

*Parker v. HNG Oil Co.*,
   732 S.W.2d 754 (Tex. App.--Corpus Christi 1987, no writ) ..................................................20

*Provident American Ins. Co. v. Castaneda*,
   988 S.W.2d 189 (Tex. 1998)...................................................................................................31

*Quality Infusion Care, Inc. v. Health Care Service Corp.*,
   628 F.3d 725 (5th Cir. 2010) ..................................................................................................27

*Rattan v. Dicker*,
   373 S.W.2d 306 (Tex. Civ. App.--Dallas 1963, no writ).......................................................23

*Republic Ins. Co. v. Stoker*,
   903 S.W.2d 338 (Tex. 1995)...................................................................................................32

*Schultz v. Weaver*,
   780 S.W.2d 323 (Tex. App.--Austin 1989, no writ)..............................................................27

*Settlement Funding, LLC v. Transamerica Occidental Life Ins. Co.*,
   555 F.3d 422 (5th Cir. 2009) ..................................................................................................27

*Simpson v. Curtis*,
   351 S.W.3d 374 (Tex. App.--Tyler 2010, no pet.).................................................................23

*Southwestern Bell Tel. Co. v. Marketing on Hold Inc.*,
   308 S.W.3d 909 (Tex. 2010)...................................................................................................27

*Tayssoun Transp., Inc. v. Universal Am-Can, Ltd.*,
   C.A. No. H-04-1074, 2005 WL 1185811 (S.D. Tex. Apr. 20, 2005) .......................................8

*Technical Automation Services Corp. v. Liberty Surplus Ins. Corp.*,
   673 F.3d 399 (5th Cir. 2012) .......................................................................................16, 23, 24

*Thalman v. Martin*,
   635 S.W.2d 411 (Tex. 1982)..................................................................................15, 25

*Townewest Homeowners Ass'n, Inc. v. Warner Communication Inc.*,
   826 S.W.2d 638 (Tex. App.--Houston [14th Dist.] 1992, no writ)..........................33

*Universe Life Ins. Co. v. Giles*,
   950 S.W.2d 48 (Tex. 1997)..........................................................................................30

**STATUTES AND RULES**

Fed. R. Civ. P. 56.................................................................................................................1

Tex. Bus. & Com. Code § 17.45(4) ..................................................................................32

Tex. Ins. Code § 541.001 ..................................................................................................32

Tex. Ins. Code § 541.061 ..................................................................................................32

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| CARMEN HINOJOSA, Individually and as | § | |
| NEXT FRIEND of HECTOR JILPAS, an | § | |
| Incapacitated Person, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. 7:14-cv-324 |
| | § | |
| METROPOLITAN LIFE INSURANCE | § | |
| COMPANY, et al., | § | |
| | § | |
| Defendants. | § | |

**THE METLIFE DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF**

Defendants Metropolitan Life Insurance Company ("MetLife"), Metropolitan Tower Life Insurance Company ("MTLIC"), Metropolitan Insurance and Annuity Company ("MIAC") n/k/a MTLIC,[1] and MetLife Insurance Company of Connecticut ("MetLife Connecticut")[2] (collectively, the "MetLife Defendants"), pursuant to Fed. R. Civ. P. 56, file this motion for summary judgment and supporting brief and state:

**SUMMARY**

The MetLife Defendants are entitled to summary judgment on their counterclaims for reformation and declaratory relief and all of the claims of Plaintiff Carmen Hinojosa ("Hinojosa"), individually and as next friend of Hector Jilpas (the "Annuitant"), an incapacitated person.  As detailed below, MetLife was requested to issue, agreed to issue, and was paid to issue an annuity providing for the payment of monthly benefits, starting at $1,929.43 per month

---

[1] Effective October 8, 2004, MIAC merged into MTLIC and thus no longer exists.  All references herein to MTLIC include MIAC.

[2] In November 2014, MetLife Connecticut was merged into and renamed MetLife Insurance Company USA.

and with 3% annual increases, for only 20 years, yet the annuity certificate that was ultimately issued (and the qualified assignment on which it was based) provided, in error, for the payment of monthly benefits starting at that level, with such payments guaranteed for 20 years and continuing for the Annuitant's life. Even though Hinojosa has now received all of the benefits payable to date for the $400,000.00 premium MetLife received, she is nonetheless seeking a windfall of over $4.3 million for what is indisputably a scrivener's error. Since the annuity certificate and the qualified assignment were prepared as a result of a mutual mistake, summary judgment is appropriate on the MetLife Defendants' counterclaims and Hinojosa's claims for breach of contract, fraud, violations of the Texas Insurance Code, violations of the DTPA, and breach of the duty of good faith and fair dealing.

## STATEMENT OF UNDISPUTED FACTS[3]

### A. Hinojosa Files the Underlying Action.

In June 1991, Hinojosa, individually and as next friend of the Annuitant, filed a lawsuit[4] (the "Underlying Action") against Gonzalo Caballero, M.D. ("Dr. Caballero") and Knapp Medical Center for the injuries the Annuitant sustained during Hinojosa's pregnancy and the Annuitant's birth. (Complaint, ¶ 4.1.) By early 1992, the parties to the Underlying Action, together with Dr. Caballero's malpractice insurer, Texas Medical Liability Insurance

---

[3] Pursuant to S.D. Tex. L.R. 7.7, the MetLife Defendants have contemporaneously herewith filed the Appendix in Support of the MetLife Defendants' Motion for Summary Judgment and Supporting Brief, which contains the summary-judgment evidence on which they are relying, is incorporated herein by reference, and has been paginated for ease of reference (e.g., App. 005).

Unless otherwise indicated, all emphases through italics are supplied by counsel.

[4] *Carmen Jilpas, individually and as next friend of Hector Jilpas, a minor v. Gonzalo Caballero, M.D. and Knapp Medical Center f/k/a Knapp Memorial Methodist Hospital*, Cause No. C-2364-91-E in the 275th Judicial District Court of Hidalgo County, Texas.

**THE METLIFE DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT AND SUPPORTING BRIEF** – **Page 2**

Underwriting Association (the "JUA"),[5] were discussing settlement, and Dr. Caballero and the JUA ultimately agreed to pay, and Hinojosa ultimately agreed to accept, his policy limits of $750,000.00.  (App. 190, 201.)  Hinojosa elected to allocate $350,000.00 of that amount to cover attorney's fees, any unpaid medical expenses, and litigation costs and the remaining $400,000.00 to purchase a structured-settlement annuity providing specified periodic payments to or for the benefit of the Annuitant.[6]  (App. 57-59, 191, 205.)

## B.  Hinojosa Considers Both a Term Certain and a Lifetime Payment Stream.

Beginning in early 1992, Hinojosa and Dr. Caballero, through their respective counsel, began working on the terms of their settlement, and their counsel communicated over time with not only the JUA and St. Paul, but also two structured-settlement brokers, Tailored Awards and Delta Group, which are based in Dallas and California, respectively.[7]  (App. 19, 201-212.)  By letter dated February 14, 1992 (App. 191, 205-206), John Ferguson ("Ferguson"), who was one of Hinojosa's counsel in the Underlying Action, informed Dr. Caballero's counsel that she wanted a structured settlement that included the following terms:

> Your client purchases for Hector Jilpas an annuity, payable in equal monthly amounts, with lump sum payments of $40,000 every five years.  The annuity should be guaranteed for Hector's life or twenty years, which ever is longer.  The annuity should be purchased from either Metropolitan Life, Northwestern Mutual, or New York Life.  The cost of the annuity (inclusive of the usual set of fees, etc.) should be $400,000.  The amount of the monthly payments should, at the end of each year, increase by approximately three percent (to reflect increases in the cost of living).  The annuity should be payable to Hector Jilpas or to his heirs.

---

[5] St. Paul Fire and Marine Insurance Company ("St. Paul") was the servicing carrier for the JUA. Hinojosa originally named the JUA and St. Paul as defendants in this action, but in November 2014, she asked the Court to dismiss her claims against them without prejudice, and the Court complied with her request.  *See* Documents 31-32.

[6] In a structured settlement, the settling defendant (or his insurer) agrees in the settlement agreement to make one or more future payments and then assigns (with the plaintiff's consent) its payment obligations to a third party, which then purchases (using funds from the settling defendant or his insurer) an annuity from yet another entity that provides for the agreed-upon payments.

[7] Tailored Awards was a subsidiary or affiliate of St. Paul.  (App. 157, 159, 189.)

(App. 205.)  In this letter, Ferguson also set forth Hinojosa's contentions that the Annuitant's damages exceeded $10 million in total, that the cost of his future home and health care needs easily exceeded $2 million, and that the settlement payment was specifically for the cost of his future health and home care needs.  (App. 206.)

On February 28, 1992, Sharon Richmond ("Richmond"), an administrative assistant with Tailored Awards, sent Delta Group 12 pages of medical records on the Annuitant to be passed on to MetLife for the determination of the Annuitant's rated age, which is a step associated with the pricing of an annuity providing for lifetime benefits.  (App. 001, 004-018.)  On March 2, 1992, MetLife sent Delta Group a Structured Settlement quote (the "Lifetime Quote"), which assigned the Annuitant a "Rated Age" of 13; listed the "Annuity Type" as "CERTAIN & LIFE;" and called for a Monthly Benefit of $1,096.94 that was set to start on April 13, 1992, was guaranteed for 20 years, and would continue "FOR LIFE," with 3% annual increases.[8]  (App. 091-092, 095-097.)

The same day, Delta Group forwarded the Lifetime Quote to John Prey ("Prey"), who was a broker with Tailored Awards, and the next day, he forwarded the details of the quote to Ferguson.  (App. 001-002, 019, 192, 208-209.)  In his cover memorandum to Ferguson, Prey stated:  "If the attached proposal is acceptable to you and your client, please advise us as soon as possible and we will proceed with the purchase process."  (App. 208.)

The record is bereft of evidence that Ferguson accepted the Lifetime Quote (*see* App. 193); instead, MetLife was requested to prepare a quote calling for the payment of monthly benefits for only 20 years, which would naturally result in a higher monthly benefit than the $1,096.94 set forth in the Lifetime Quote.  On March 3, 1992, MetLife sent Delta Group another

---

[8] The Lifetime Quote also called for lump-sum payments of $40,000.00 to be paid on March 13, 1997, March 13, 2002, March 13, 2007, March 13, 2012, and March 13, 2017.  (App. 097.)

Structured Settlement quote (the "20-Year Certain Quote"), which listed the "Annuity Type" as

"TERM CERTAIN" and called for a Monthly Benefit of $1,929.43 to start on April 13, 1992 and

end on March 13, 2012, with 3% annual increases.[9]  (App. 092, 098-099.)

## C.   Hinojosa Accepts the 20-Year Certain Quote.

On or about March 4, 1992, Tailored Awards learned that Hinojosa had elected (through

Ferguson[10]) to accept the 20-Year Certain Quote, and that day, Richmond sent fax memoranda to

both Ferguson and Omar Garza (App. 164-165, 193, 211-212), who was one of Dr. Caballero's

attorneys, providing as follows:

> The following is a summary of the settlement annuity to be purchased on March
> 13, 1992 for the benefit of Hector Jilpas:
>
> | Life Company: | Metropolitan Life Insurance Company |
> | Assignee: | Metropolitan Insurance and Annuity Company |
> | Benefits: | 1. | $1,929.43 payable monthly for 20 years certain only, commencing 4-13-1992. |
> | | 2. | Guaranteed lump sums: |
>
> $40,000 payable on 3-13-1997
> $40,000 payable on 3-13-2002
> $40,000 payable on 3-13-2007
> $40,000 payable on 3-13-2012
> $40,000 payable on 3-13-2017

(App. 211-212.)  The record is bereft of any evidence indicating that Ferguson (or any of

Hinojosa's other counsel) objected to this confirmatory memorandum or claimed that this

payment stream was incorrect in any way.  *See* App. 165, 177-178, 181-182, 194.  The next day,

Richmond sent Delta Group the Annuitant's birth certificate and a handwritten application

calling for "$1,929.43 payable monthly for 20 years certain, commencing 4-13-92" and five

lump-sum payments of $40,000.00 payable every five years (App. 002, 020-023), which were

---

[9] The 20-Year Certain Quote also called for lump-sum payments of $40,000.00 to be paid on March 13, 1997, March 13, 2002, March 13, 2007, March 13, 2012, and March 13, 2017.  (App. 099.)

[10] At her deposition, Richmond testified that it was Ferguson, and not Dr. Caballero, the JUA, the brokers, or MetLife, that ultimately decided which MetLife quote was to be accepted.  (App. 180-181.)

the payment streams set forth in the 20-Year Certain Quote.[11]

On March 10, 1992, Delta Group sent MetLife a check from the JUA in the amount of $400,000.00 and a copy of the 20-Year Certain Quote (App. 002, 026-028), both of which contain file stamps indicating MetLife received them on March 11, 1992.  (App. 092, 101-103.) The same day, MetLife acknowledged receipt of this check and informed Delta Group that, before it could issue the annuity certificate and process the benefit payments, it needed copies of the signed annuity application, the signed settlement agreement, the signed assignment agreement, and the direction of payments form.  (App. 092, 104.)

**D.**     **The Guardian Ad Litem Inquires About a Payment Stream With a
            <u>Higher Monthly Benefit, Which MetLife Generates but Is Not Accepted</u>.**

In the meantime, John David Franz ("Franz"), who was the guardian ad litem for the Annuitant, explored the possibility of an alternative payment stream that featured an even higher monthly benefit than that in the 20-Year Certain Quote, albeit with lower lump-sum payments. (App. 002, 029.)  On March 16, 1992, Delta Group requested, at Franz's request, a quote from MetLife that cut the $40,000.00 lump-sum payments in half and applied the excess premium to increasing the starting monthly benefit from the $1,929.43 in the 20-Year Certain Quote.  (App. 029.)  The same day, MetLife sent Delta Group a revised Structured Settlement quote for a "TERM CERTAIN" annuity with a Monthly Benefit of $2,165.49 to start on April 13, 1992 and end on March 13, 2012, with 3% annual increases.[12]  (App. 092, 105-106.)  This quote was not accepted by Franz and/or Hinojosa (App. 194-195, 213), who continued to proceed with the 20-

---

[11] Neither Richmond's confirmatory memoranda dated March 4, 1992 nor the handwritten application referenced the 3% annual increases set forth in the 20-Year Certain Quote (App. 022, 099, 211-212); however, that omission would have reduced the price of the annuity (App. 182-183) and, as detailed below, was corrected in the typewritten application that was subsequently submitted to MetLife. *See* App. 032.

[12] This quote also called for lump-sum payments of $20,000.00 to be paid on March 13, 1997, March 13, 2002, March 13, 2007, March 13, 2012, and March 13, 2017. (App. 106.)

Year Certain Quote.

**E.**   **Hinojosa, Dr. Caballero, and the JUA Sign the Settlement Agreement.**

On March 25, 1992, the parties to the Underlying Action signed the Minor Settlement Agreement and Release (the "Settlement Agreement") (App. 003, 056-066; *see also* Complaint, ¶ 4.1), which called for Dr. Caballero and/or the JUA to make a lump-sum payment of $350,000.00 for medical expenses, attorney's fees, and other litigation costs and then set forth the *exact same* payment streams in the 20-Year Certain Quote:

B.      That **CARMEN JILPAS**, individually and as next friend and as guardian of **HECTOR JILPAS**, has agreed that **TEXAS MEDICAL LIABILITY INSURANCE UNDERWRITING ASSOCIATION** shall make or cause to be made on behalf of the Defendant periodic payments to **CARMEN JILPAS**, for the use and benefit of **HECTOR JILPAS** through the purchase of an annuity from Metropolitan Life Insurance Company on the following schedule:

(1)      The sum of $1,929.43 per month.  Said monthly payments to increase at 3% per year compounded annually, and to begin as of April 13, 1992 with all future monthly payments continuing thereafter, payable on the 13th day of every month until the final guaranteed monthly payment due on March 13, 2012.  In the event of the death of **HECTOR JILPAS** prior to March 13, 2012, the remainder of the guaranteed monthly payments shall continue to be paid as they fall due on a monthly basis to the Estate of **HECTOR JILPAS** through March 13, 2012.

(2)      The following lump sums on the specified dates:

| Payment | Date Payable |
| --- | --- |
| $40,000.00 | March 13, 1997 |
| $40,000.00 | March 13, 2002 |
| $40,000.00 | March 13, 2007 |
| $40,000.00 | March 13, 2012 |
| $40,000.00 | March 13, 2017 |

Said lump sum payments are to be deposited into a trust for the use and benefit of **HECTOR JILPAS** under §142.05 of the Texas Property Code.  In the event of the death of **HECTOR JILPAS** prior to March 13, 2017, the remaining lump sum payments shall continue to be paid as they fall due to the Estate of **HECTOR**

JILPAS.[13]

(App. 058 (bold and all caps in original).)

**F.    The Trial Court Signs the Judgment.**

The same day the parties signed the Settlement Agreement, the Court in the Underlying Action signed the Judgment (App. 002, 034-041), which set forth the same payment streams as in the 20-Year Certain Quote and the Settlement Agreement.  (App. 038.)  Even though Ferguson had requested in his letter dated February 14, 1992 that the settlement payment be "specifically for the cost of [the Annuitant's] future health and home care needs" (App. 206), the Judgment stated:   "The Court finds that the settlement sums are for payment of damages for [the Annuitant's] past physical impairment and for no other element of damage."  (App. 039.)

**G.    MetLife Receives the Application, Which Calls for a 20-Year Certain Payment Stream Starting at $1,929.43 Per Month.**

On April 10, 1992, Delta Group sent MetLife copies of the Request for Structured Settlement (the "Application"), the Annuitant's birth certificate, and the Judgment from the Underlying Action.  (App. 002, 030-041.)  In the Application, MTLIC applied to MetLife for an annuity that, in addition to the five $40,000.00 lump-sum payments, paid "$1,929.43 monthly for 20 years certain to begin 4/13/92.  Increasing 3% compounded annually."  (App. 032.)  In her cover memo, Delta Group's administrative assistant noted that the "[p]ayment schedule remained the same as originally funded."  (App. 030.)  As such, the 20-Year Certain Quote, the Settlement Agreement, the Judgment, and the Application all contemplated monthly payments starting at

---

[13] The MetLife Defendants are not parties to (or signatories of) the Settlement Agreement and did not play any role in its drafting.  As such, any ambiguities in the Settlement Agreement's terms should be construed against Hinojosa and the Annuitant (who are parties to it) and cannot be construed against the MetLife Defendants.  *See Tayssoun Transp., Inc. v. Universal Am-Can, Ltd.*, C.A. No. H-04-1074, 2005 WL 1185811, at *7 (S.D. Tex. Apr. 20, 2005) ("If a contract is subject to more than one reasonable interpretation, courts must use *contra proferentum* and adopt the construction most favorable to the non-drafting party."); *see also McKenna v. Caldwell*, 387 S.W.3d 830, 835 (Tex. App.--Eastland 2012, no pet.) ("Because Caldwell drafted the partition deed, including the easement language, it should be construed against him.").

$1,929.43 per month, with 3% annual increases, for only 20 years.

**H.     The JUA (Through St. Paul) Signs the Original UQA, Which Calls for
a 20-Year Certain Payment Stream Starting at $1,929.43 Per Month.**

As part of its work on this matter, Tailored Awards prepared the Uniform Qualified
Assignment (the "Original UQA"), which was intended to memorialize the assignment of Dr.
Caballero's periodic payment obligations in the Settlement Agreement to MTLIC, and Richmond
forwarded that document to St. Paul for execution on the JUA's behalf.  (App. 171-172.)  On or
about April 20, 1992, St. Paul's representative signed the Original UQA (App. 003, 067-069),
and Addendum No. 1, which is entitled "Description of Periodic Payments," included the *same*
payment streams that are set forth in the 20-Year Certain Quote, the Settlement Agreement, the
Judgment, and the Application.  (App. 069.)

On April 22, 1992, Richmond sent the Settlement Agreement and the Original UQA to
Delta Group, which forwarded those documents to MetLife for final approval.  (App. 002-003,
054-069.)  The following week, however, MetLife returned the Original UQA to Delta Group
with a request that it be corrected to identify the beneficiary of the payments in the event the
Annuitant died during the 20 years that monthly benefits were payable.  (App. 092, 107-110.)
On May 8, 1992, Delta Group forwarded the Original UQA to Richmond and asked that it be
revised in accordance with MetLife's request.  (App. 003, 070-074.)

**I.      Tailored Awards Prepares the Erroneous UQA, Which Provides
in Error for Lifetime Benefits Starting at $1,929.43 Per Month.**

Unfortunately, when Tailored Awards prepared a revised Uniform Qualified Assignment
(the "Erroneous UQA") that included the beneficiary information requested by MetLife (App.
173), it also completely reworded Addendum No. 1 so that it called, in error, for the payment of
monthly benefits, starting at $1,929.43 per month, for the remainder of the Annuitant's life:

The following benefits shall be payable to Carmen Jilpas as Next Friend and

Guardian of Hector Jilpas, or such successor guardian of whom Assignee is notified in writing prior to a payment being made:

1. *$1,929.43 on the 13th day of each month beginning 4-13-1992.* The amount of the payment shall increase by 3% on the 13th day of April each year beginning with 4-13-1993. *These payments are guaranteed for 20 years or for the life of Hector Jilpas, if longer.*

2. Guaranteed lump sums:

   $40,000 payable on 3-13-1997

   $40,000 payable on 3-13-2002

   $40,000 payable on 3-13-2007

   $40,000 payable on 3-13-2012

   $40,000 payable on 3-13-2017

Beneficiary Information:

In the event of the death of Hector Jilpas, any remaining guaranteed payments shall be made to the Estate of Hector Jilpas.

(App. 079; *see also* App. 075-076, 173-175.)   The Erroneous UQA thus used the starting payment amount ($1,929.43) in the 20-Year Certain Quote, rather than the lower starting amount ($1,096.94) in the Lifetime Quote.  (App. 079, 097, 099.)  Richmond admitted that this change in the starting payment amount was not the result of additional negotiations between the parties or the payment of a larger premium to MetLife:

Q. So the payment stream in the original uniform qualified assignment has changed from 20-year certain to lifetime, albeit at the same monthly benefit amount.

A. Correct.

Q. To date, have you seen any quotes from MetLife agreeing to provide $1,929.43 for life, plus the five annual lump sum payments?

A. No.

Q. In fact, the amount that MetLife had agreed to pay for life -- to pay for lifetime was under $1,100 per month.

A.     Correct.

Q.     *Have you seen to date any documents whereby MetLife received additional payment in order to issue an annuity to this effect?*

A.     *No.*

Q.     *Have you seen any documents to date reflecting additional negotiations between the parties that would have changed the benefit stream to be provided?*

A.     *No.*

(App. 174.)[14]  Richmond further testified that the payment stream on Addendum No. 1 to the

Erroneous UQA was a mistake that was more likely than not made by her:

Q.     Is the payment stream set forth on the last page of the revised uniform qualified assignment consistent with the agreement that the parties made?

       MR. HILLIN: Objection, form.

A.     It's not consistent with what was in the settlement agreement or the judgment or the quote sheet or the application.

Q.     (BY MR. WHITAKER) All four of the documents you just mentioned contemplated the payment of $1,929.43 for 20 years certain only.

       MR. HILLIN: Objection, form, calls for expert testimony, not designated, not qualified.

A.     Yes.

Q.     (BY MR. WHITAKER) *Do you have any explanation for why the payment stream on the last page of the revised uniform qualified assignment changed?*

A.     *No.*

Q.     *Does it appear to be a mistake?*

A.     *Yes.*

Q.     *And not to blame you unnecessarily for things, but is it more likely than not that that mistake was made by you?*

---

[14] Richmond also testified that, since all three of the quotes from MetLife used the same Effective Date and Purchase Date, there would not have been any market changes or pricing changes that would have impacted MetLife's calculations.  (App. 183.)

A.    *Yes.*

(App. 174-175; *see also* App. 183.)

MetLife would have charged $633,949.00, which is substantially higher than the $400,000.00 it received, to issue an annuity calling for lifetime benefits at this higher starting amount.  (App. 089-090.)  On May 19, 1992, Richmond sent the Erroneous UQA to Delta Group.  (App. 003, 075.)  On June 1, 1992, Delta Group sent MetLife the Erroneous UQA (App. 003, 076-079), and MTLIC's representative signed it in error (App. 093, 115-117), as it improperly called for the payment of lifetime benefits starting at $1,929.43 per month.

**J.     The Erroneous UQA Limits MetLife's Payment Obligations
         to the Payment Obligations of Dr. Caballero and the JUA.**

Importantly, however, the Erroneous UQA (which is one of the two documents relied upon by Hinojosa in support of her claim for lifetime benefits starting at $1,929.43 per month) establishes that MetLife's payment obligations cannot be greater than the obligations that Dr. Caballero and the JUA agreed to assume in the Settlement Agreement:

> NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the parties agree as follows:
>
> 1.    The Assignor [i.e., the JUA] hereby assigns and the Assignee [i.e., MTLIC] hereby assumes *all of the Assignor's liability* to make the Periodic Payments.  The Assignee assumes no liability to make any payment not specified in Addendum No. 1.
>
> * * *
>
> 3.    *The Assignee's liability to make the Periodic Payments is no greater than*

> *that of the Assignor immediately preceding this Agreement*.[15]   Assignee is not required to set aside specific assets to secure the Periodic Payments. The Claimant has no rights against the Assignee greater than a general creditor.   None of the Periodic Payments may be accelerated, deferred, increased, or decreased and may not be anticipated, sold, assigned or encumbered.
>
> * * *
>
> 10.   This Agreement shall be binding upon the respective representatives, heirs, successors and assigns of the Claimant, the Assignor and the Assignee and upon any person or entity that may assert any right hereunder or to any of the Periodic Payments.

(App. 115-116.)  As such, notwithstanding the terms of Addendum No. 1 to the Erroneous UQA,

MetLife is not liable for lifetime monthly payments starting at $1,929.43 per month because Dr.

Caballero and the JUA were not liable for such payments.

**K.     The Certificate Limits MetLife's Payment
         Obligations to the Actual Amount of Premium Paid.**

This incorrect payment stream made its way into Certificate No. 32301 (the "Certificate")

(App. 093, 118-120), which called for, in error, the following monthly payments:

> On and after the Annuity Commencement Date *and while the Measuring Life is living*, but in any case up to and including March 13, 2012, Metropolitan will pay monthly annuity payments to the payee named by the Owner.  If the Measuring Life dies before March 13, 2012, and unless the Owner directs otherwise, Metropolitan will pay to the Beneficiary, up to and including March 13, 2012, the monthly annuity payments that are payable after the death of the Measuring Life. The rate of the monthly annuity payments is shown in item (1) below.
>
> (1)     Monthly Rate of Annuity:  $1,929.43 commencing on April 13, 1992 and increased by 3% every April 13 thereafter.

---

[15] The Settlement Agreement contains a comparable provision:

> If the Liability to make the periodic payments is assigned by way of a qualified assignment, the parties acknowledge and agree that the Assignee's obligation for payment of the periodic payments shall be no greater than that of **GONZALO CABALLERO, M.D.**, and/or **TEXAS MEDICAL LIABILITY INSURANCE UNDERWRITING ASSOCIATION** (whether by judgment or agreement) immediately preceding the assignment of the periodic payment obligation.

(App. 061 (bold and all caps in original).)

(App. 120.)

Importantly, however, the "Misstatements" section of the Certificate establishes that, in the event of an error, the payment stream set forth in the Certificate must be corrected so as to be consistent with the premium paid for it:

> **Misstatements:**  If the age or sex of the Measuring Life *or any other relevant fact* has been misstated, *Metropolitan will not pay a greater amount of annuity than that provided by the actual amount received to purchase the annuity and the correct information*.  Any overpayment of annuity will, together with interest, be deducted from future annuity payments.  Any underpayment of an annuity will, together with interest, be paid immediately upon receipt of the corrected information.  The interest rate(s) will be that used in determining the purchase price of the annuity.

(App. 119.)  This provision thus ties MetLife's payment obligations to the 20-Year Certain Quote and thereby overcomes any errors in the drafting of the Certificate.

Even though MetLife had agreed to the payment stream in the 20-Year Certain Quote and the Application, which did not include lifetime monthly benefits, in July 1992, Delta Group sent Richmond copies of the Erroneous UQA and the Certificate, both of which called for lifetime benefits starting at $1,929.43 per month.   (App. 003, 080-087.)   Richmond then distributed copies of those documents to (among other recipients) counsel for Hinojosa and Dr. Caballero. (App. 198, 218-225.)

**L.     MetLife Pays Full Monthly Benefits, Starting at
$1,929.43 Per Month, to Hinojosa for Twenty Years.**

MetLife paid full monthly benefits, as well as the first four $40,000.00 lump-sum payments, to Hinojosa through March 13, 2012; however, consistent with its belief (as well as the agreement of the parties in the Underlying Action) that it owed monthly payments for only 20 years, MetLife did not make a monthly payment on April 13, 2012.  (App. 093, 122.)  By letter dated October 3, 2012, Hunter Hillin ("Hillin"), who is Hinojosa's counsel, complained of MetLife's refusal to make additional monthly payments and threatened to seek treble damages

under the Texas Insurance Code and DTPA.  (App. 093, 123-127.)  On October 10, 2012,

Londone Moulds, a supervisor with MetLife, sent Hillin copies of the Settlement Agreement, the

Judgment, and the Certificate and stated that "the annuity payments for this case are not lifetime

benefits."  (App. 093, 128-151.)  By letter dated December 9, 2013, Hillin nonetheless asserted

that the Annuitant was entitled to monthly benefits for an additional 50 years, which (by Hillin's

calculation) had a present value of $1,033,302.02.  (App. 093-094, 152-154.)  After trebling this

amount and adding his 40% contingency fee, Hillin demanded $4,339,868.48 from MetLife.

(App. 153.)

## ARGUMENT AND AUTHORITIES

### A.   MTLIC and MetLife Are Entitled to Summary Judgment on Their Counterclaims for Reformation and Declaratory Relief.

Initially, MTLIC and MetLife are entitled to summary judgment on their counterclaims

for reformation and declaratory relief, as the Erroneous UQA and the Certificate were prepared

in error and must be reformed to reflect the fact that MetLife was asked to issue, agreed to issue,

and was paid to issue an annuity calling for monthly payments starting at $1,929.43 per month,

with 3% annual increases, for only 20 years.[16]

As the Fifth Circuit recently observed, "[t]he underlying objective of reformation is to

correct a mutual mistake made in preparing a written instrument, so that the instrument truly

reflects the original agreement of the parties." *Lawyers Title Ins. Corp. v. Doubletree Partners,*

*L.P.*, 739 F.3d 848, 857 (5th Cir. 2014).  Reformation does not change the agreement; rather,

---

[16] Where (as here) the underlying facts are undisputed, the Court can order reformation as a matter of law. *See Davis v. Grammer*, 750 S.W.2d 766, 768 (Tex. 1988) (reversing the court of appeals' judgment and remanding the case to the trial court for reformation of the deed at issue); *Thalman v. Martin*, 635 S.W.2d 411, 414 (Tex. 1982) (ordering reformation as a matter of law).  The same is true even if the underlying mistake is one of law.  *See Brinker v. Wobaco Trust Ltd.*, 610 S.W.2d 160, 166 (Tex. Civ. App.--Texarkana 1980, writ ref'd n.r.e.) ("Any mistake of the scrivener which would defeat the true intention may be corrected in equity by reformation, whether the mistake is one of fact or law.").

"[i]t orders a change in the drafted agreement so that it will correctly express what has been the real agreement from its inception."  *Brinker*, 610 S.W.2d at 166; *see also Technical Automation Services Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 408 (5th Cir. 2012) ("In the course of reformation, obligations to which the parties have not assented in reaching the original agreement are expunged by the court.").  To prevail on their counterclaim for reformation, MTLIC and MetLife must show that "(1) an original agreement exists between the parties and (2) a mutual mistake occurred, made after the original agreement, in reducing the agreement to writing."  *Doubletree Partners*, 739 F.3d at 857.  As detailed below, both of these elements are satisfied here as a matter of law.

First, it is clear that the parties originally agreed that MetLife was to make monthly payments of $1,929.43, starting on April 13, 1992 and with 3% annual increases, for only 20 years.  Neither the 20-Year Certain Quote nor the Application suggest (let alone state) that lifetime monthly payments are at issue, and they are undoubtedly the key documents in ascertaining what benefits MetLife thought it was being asked to provide and ultimately agreed to provide.  In fact, prior to the time Hinojosa and Dr. Caballero entered into the Settlement Agreement, MetLife had informed them that it was willing, in return for the payment of $400,000.00, to issue an annuity calling for the payment of monthly benefits beginning on April 13, 1992, with 3% annual increases, and five annual lump-sum payments every five years, with the following additional terms:

- a monthly benefit of $1,096.94 to continue for the Annuitant's life, with 20 years guaranteed, and lump-sum payments of $40,000.00 (App. 097);

- a monthly benefit of $1,929.43 to continue for only 20 years, and lump-sum payments of $40,000.00 (App. 099); or

- a monthly benefit of $2,165.49 to continue for only 20 years, and lump-sum payments of $20,000.00 (App. 106).

On March 4, 1992, Richmond confirmed with Ferguson that Hinojosa was selecting the second option (App. 212), which was the 20-Year Certain Quote, and that selection was memorialized in the Settlement Agreement, in which Dr. Caballero (through the JUA) agreed to pay an unspecified amount to MetLife for an annuity with the following schedule for the payment of monthly benefits:

> The sum of $1,929.43 per month.  Said monthly payments to increase at 3% per year compounded annually, and to begin as of April 13, 1992 with all future monthly payments continuing thereafter, payable on the 13th day of every month until the final guaranteed monthly payment due on March 13, 2012.  In the event of the death of **HECTOR JILPAS** prior to March 13, 2012, the remainder of the guaranteed monthly payments shall continue to be paid as they fall due on a monthly basis to the Estate of **HECTOR JILPAS** through March 13, 2012.

(App. 058 (bold and all caps in original).)

Although the first sentence of this provision does not limit MetLife's payment obligations in any way, it also omits any detail as to when those payments start or whether there are any increases in the payment amount over time.  Rather, *all* of the information regarding the onset and end of the monthly payments is set forth in the *second* sentence, which provides that the last payment is "the final guaranteed monthly payment due on March 13, 2012."  And, the third sentence confirms that, in the event the Annuitant died before MetLife had made 20 years' of monthly payments, the remaining monthly payments would be made to his estate.  Unlike Addendum No. 1 to the Erroneous UQA and the Certificate, nothing in the Settlement Agreement, expressly or impliedly, calls for the payment of lifetime benefits.[17]

It is equally clear that the $320,747.64 MetLife received as the Step Consideration for the

---

[17] As noted above, since the MetLife Defendants are not parties to the Settlement Agreement and did not play any role in its drafting, any ambiguities in its terms must be construed against Hinojosa and the Annuitant.

monthly payments it was agreeing to make[18] was consistent with 20 years of guaranteed monthly payments starting at $1,929.43 per month, with 3% annual increases, and that MetLife would have either (1) required the payment of $633,949.00 before it would have agreed to pay lifetime benefits under the same terms (i.e., starting at $1,929.43 per month with 3% annual increases) or (2) offered a substantially lower initial monthly benefit of $1,096.94 (as set forth in the Lifetime Quote) before agreeing to pay, for the same $400,000.00 premium it received, benefits for the Annuitant's life.  Regardless of whether Hinojosa *wanted* to obtain lifetime benefits or *believed* she had done so,[19] the settlement payment that she secured from the JUA was sufficient to purchase only the monthly payments that MetLife has already paid.

Second, it is clear that, after the parties made their original agreement, the Erroneous UQA and, by extension, the Certificate were prepared as a result of a mutual mistake.  As detailed above, the 20-Year Certain Quote, the Settlement Agreement, the Judgment, the Application, and the Original UQA uniformly indicated that MetLife was being asked to pay monthly benefits for only 20 years, and the JUA (through St. Paul[20]) and MTLIC, who were the two parties to the Erroneous UQA, and MTLIC and MetLife, who were the two parties to the Certificate, believed at all relevant times that MetLife was to pay monthly benefits of $1,929.43, with 3% annual increases, for only 20 years.  In May 1992, however, Tailored Awards prepared the Erroneous UQA, which mistakenly contemplated, as a result of a scrivener's error, the

---

[18] According to the 20-Year Certain Quote, $320,747.64 of the Step Consideration was for the monthly payments from April 13, 1992 through March 13, 2012, with $78,501.67 for the five lump-sum payments of $40,000.00 that were payable every five years and $750.00 for the assignment fee.  (App. 099.)

[19] In fact, the chronology set forth above establishes that Hinojosa had decided by mid-March 1992 that she preferred the larger monthly payments associated with a 20-year monthly benefit period and even sought, through Franz's request on March 16, 1992, to further increase the initial monthly payment by reducing the five lump-sum payments from $40,000.00 to $20,000.00.  (App. 029.)

[20] In signing the Original UQA, the JUA (through its servicing carrier, St. Paul) indicated its belief that monthly benefits were to be payable to Hinojosa and the Annuitant for only 20 years.  (App. 067-069.)

payment of monthly benefits, starting at this higher amount, for the Annuitant's lifetime.  (App. 079, 174-175, 183-184.)   These undisputed facts establish that the Erroneous UQA and the Certificate must be reformed.  *See Hatch v. Williams*, 110 S.W.3d 516, 522 (Tex. App.--Waco 2003, no pet.) (observing that "the fact that an error was caused by a scrivener's failure to embody the true agreement of the parties in a written instrument is a proper ground for reformation").

Hinojosa is not a party to either the Erroneous UQA or the Certificate, but reformation is required even if her beliefs are taken into account.  That is, even though Ferguson, who was one of Hinojosa's attorneys in the Underlying Action, initially professed a desire for lifetime benefits, by no later than March 4, 1992, they had agreed to the payment stream set forth in the 20-Year Certain Quote (App. 212), and the record is bereft of any evidence that either Ferguson or Hinojosa complained of the confirmatory memorandum that Richmond sent him.

Moreover, although this requirement is characterized as "mutual mistake," courts have recognized that it is established when one party makes a mistake and the other party either (1) has knowledge of the mistake or (2) otherwise engages in fraud or other inequitable conduct. *See Doubletree Partners*, 739 F.3d at 857 (noting that a unilateral mistake by one party, coupled with "knowledge of that mistake by the other party, is equivalent to mutual mistake")[21]; *First Nat'l Bank of Andrews v. Jones*, 635 S.W.2d 950, 953 (Tex. App.--Eastland 1982, writ ref'd n.r.e.) ("Where there has been a mistake of one party, accompanied by fraud or other inequitable conduct of the remaining party, the instrument may be made to conform to the agreement or

---

[21] This precept is well-established in Texas law.  *See Davis,* 750 S.W.2d at 768 ("Unilateral mistake by one party, and knowledge of that mistake by the other party, is equivalent to mutual mistake."); *Hamberlin v. Longview Bank & Trust Co.*, 770 S.W.2d 12, 14 (Tex. App.--Texarkana 1989, writ denied) (same); *see generally Givens v. Ward*, 272 S.W.3d 63, 71 (Tex. App.--Waco 2008, no pet.) (observing that this principle "is not some novel legal theory" and "has been recognized for decades by various courts and by respected commentators").

transaction entered into, according to the intention of the parties.").[22]  Here, MTLIC indisputably made a mistake in signing the Erroneous UQA, which resulted in the mistaken preparation of the Certificate, and Hinojosa either had knowledge of this mistake or engaged in inequitable conduct with respect to it.

First, it is clear that Hinojosa had knowledge of this mistake.  In July 1992, Richmond distributed copies of the Erroneous UQA and the Certificate to, among other recipients, Ferguson (App. 198, 218-225), and according to Hinojosa, the only document she had in her possession regarding the settlement of the Underlying Action was the Erroneous UQA (Document 33 at 4). Hinojosa nonetheless never took any steps to inform MetLife that the Erroneous UQA was inconsistent with the 20-year certain payment stream that Ferguson had agreed to on her behalf in March 1992; to the contrary, she promptly complained in April 2012 when MetLife stopped paying monthly benefits to her (App. 121) and is now seeking a windfall for a clerical error. Since Hinojosa has had, from the outset, actual knowledge of this mistake, reformation is warranted.  *See Parker v. HNG Oil Co.*, 732 S.W.2d 754, 755-56 (Tex. App.--Corpus Christi 1987, no writ) (reforming a release when a party, due to clerical error, failed to include an agreed-upon exception in the release and the other party had knowledge of and attempted to take advantage of the first party's mistake); *see also Hill v. Spencer & Son, Inc.*, 973 S.W.2d 772, 775 (Tex. App.--Texarkana 1998, no pet.) (noting that "[k]nowledge of the mistake by one party and his failure to reveal it to the other party" amounts to a mutual mistake).

In *Doubletree Partners*, the title insurer sought to reform a title insurance policy that, due

---

[22] Numerous courts have recognized this concept.  *See, e.g.*, *Ace Drug Marts, Inc. v. Sterling*, 502 S.W.2d 935, 939 (Tex. Civ. App.--Corpus Christi 1973, writ ref'd n.r.e.) (affirming the reformation of a lease agreement where, otherwise, the situation would be "an economic advantage to the appellants and an economic detriment to the appellees that was not the bargain the parties made"); *Automobile Ins. Co. of Hartford, Conn. v. United Elec. Service Co.*, 275 S.W.2d 833, 839 (Tex. App.--Fort Worth 1955, writ ref'd n.r.e.) (noting that reformation is appropriate "where there has been a mistake of [a] party accompanied by fraud or inequitable conduct of the other party").

to a software printing error, did not include many of the encumbrances listed as exceptions or the agreed-upon survey coverage, and the Fifth Circuit found a mutual mistake where one party prepared the erroneous document and the other party received a copy of it:

> Here, the summary judgment evidence shows that an original agreement did exist between Doubletree and Lawyers Title. The final title commitment reflects agreement on the terms of the title insurance policy. That agreement included both an exception for the flowage easement and the survey coverage purchased by Doubletree. Further, the summary judgment evidence shows that Doubletree paid an additional premium to amend the survey clause to obtain survey coverage. Based on this evidence, the first part of the contract reformation test is satisfied.
>
> The summary judgment evidence also reflects that Lawyers Title made a unilateral mistake in reducing the agreement to a final writing, and that Doubletree had knowledge of the mistake. As Lawyers Title explained, a software error resulted in the printing of the policy without including either the flowage easement exception or the survey coverage. Doubletree clearly had knowledge of this mistake since it paid a premium for survey coverage and received the final title commitment reflecting the coverage, but later received a policy from Lawyers Title that differed materially from the agreed-upon terms in the final title commitment. Indeed, the two title insurance claims Doubletree submitted to Lawyers Title were based on the original, flawed policy, and those claims noted that the policy it received lacked the flowage easement exception. Therefore, there is no question that Doubletree knew of the unilateral mistake by Lawyers Title in reducing the agreement to writing. Because a unilateral mistake by one party and knowledge of that mistake by the other party is equivalent to mutual mistake, the second part of the contract reformation test is also satisfied.

739 F.3d at 857-58.

Independent of the foregoing, reformation is appropriate because Hinojosa has engaged in inequitable conduct with respect to this mistake. After all, the amount that Hinojosa was able to secure in settlement from Dr. Caballero was sufficient to provide monthly benefits starting at either $1,096.94 for the Annuitant's life (with 20 years guaranteed) or $1,929.43 for only 20 years. Even though MetLife has now paid her monthly benefits starting at $1,929.43 per month, with 3% annual increases, for 20 years, she is now seeking a windfall of $4.3 million from MetLife (App. 153) for what is essentially a clerical error.

**THE METLIFE DEFENDANTS' MOTION FOR**
**<u>SUMMARY JUDGMENT AND SUPPORTING BRIEF</u> – Page 21**

For example, in *Sterling*, the lessor sued to reform a lease.  Even though the prior negotiations had established that the lessee would pay the utility bills, the lease that the parties executed, which was prepared by the lessor's counsel, clearly provided that the lessor was responsible for the utility bills.  One of the lessee's principal shareholders testified that he discovered the mistake in the lease but considered it an offer by the lessor to pay the utilities.  The trial court permitted reformation, and the court of appeals affirmed, stating:

> The record further reflects that the matter of who would pay the utilities was subject to discussion and negotiation prior to July 26th and that utilities were mentioned and an agreement made on July 26th that the appellants (lessees) should pay the utilities.  No further discussion or mention was made regarding the utilities between the parties before the time of, or at the time of, the execution of the lease on August 2nd.  Any assumption that, if the agreement was to be changed regarding who was to pay the utilities, there would be no mention by the appellants at the August 2nd meeting of approximately one-half change in the monthly rental payments ($650.00-$300.00) does not comport with human experience.  The appellants considered the change either a windfall to them (a bargain they did not make) or a mistake of the appellees.  This conduct, of not mentioning the change, on the part of the appellants was "inequitable conduct" set forth in *Conn*, supra, or "such inequitable conduct as to amount to fraud" as stated at page 946 of *Warren*, supra.  The judgment of reformation by the trial court can be sustained on this ground of "inequitable conduct" and we so hold.

502 S.W.2d at 939-40; *see also Cambridge Cos., Inc. v. Williams*, 602 S.W.2d 306, 309 (Tex. Civ. App.--Texarkana 1980) (finding that the conduct of the plaintiff's agent "in failing to mention the mistake in the commission note to [the defendant] constituted inequitable conduct as a matter of law"), *aff'd*, 615 S.W.2d 172 (Tex. 1981).

In addition, reformation is required based on the "Misstatements" section of the Certificate, which establishes that the payment stream set forth in the Certificate must be corrected so as to be consistent with the premium paid for it:

> **Misstatements:**  If the age or sex of the Measuring Life *or any other relevant fact* has been misstated, *Metropolitan will not pay a greater amount of annuity than that provided by the actual amount received to purchase the annuity and the correct information*.  Any overpayment of annuity will, together with interest, be deducted from future annuity payments….

(App. 119.)  This provision ties MetLife's payment obligations to the 20-Year Certain Quote and provides further support for the reformation of the Certificate.

Moreover, Hinojosa's arguments to the contrary are all without merit.  First, Hinojosa will likely contend that the Court cannot consider the summary-judgment evidence relied on by the MetLife Defendants because of the parol evidence rule.[23]  Notwithstanding Hinojosa's claims to the contrary, the Court should *not* begin its analysis with the terms of the Erroneous UQA and the Certificate; instead, since MTLIC and MetLife have alleged that those documents are the result of a mutual mistake, the Court must *first* determine whether those documents reflect the parties' true agreement, which entails by definition consideration of extrinsic evidence.  *See Technical Automation Services Corp.*, 673 F.3d at 409 (observing that the consideration of extrinsic evidence "should not have ended the court's mutual mistake inquiry; it should have begun it").  Courts have thus determined that the parol evidence rule is inapplicable where, as here, a court is determining whether there was a mutual mistake, and this is true "even if the contract is unambiguous or fully integrated."[24]  *Id.* at 408.  In fact, the Fifth Circuit has noted that

---

[23] This rule "excludes evidence of prior or contemporaneous negotiations and representations that are introduced to vary, add to, or contradict the terms of a valid written instrument, which the rule presumes embodies the complete agreement between the parties."  *Harville Rose Service v. Kellogg Co.*, 448 F.2d 1346, 1349 (5th Cir. 1971), *cert. denied*, 405 U.S. 987 (1972).

[24] Numerous courts have reached the same conclusion.  *See, e.g.*, *Olvey v. Jones*, 156 S.W.2d 977, 982 (Tex. 1941) (noting that, where a written instrument fails to express the parties' agreement as a result of a mutual mistake, "parol evidence is admissible to reform a written instrument where there are allegations of mutual mistake.");  *Sterling*, 502 S.W.2d at 939 (observing that, where a party has alleged mutual mistake as a ground for relief from a written instrument, "parol and extrinsic evidence is admissible");  *Rattan v. Dicker*, 373 S.W.2d 306, 309 (Tex. Civ. App.--Dallas 1963, no writ) (noting that it is "well settled that [the parol evidence] rule is subject to well defined exceptions and one of the most important of which is the case where equity is called upon to reform a written instrument because of

a party's claim of mutual mistake "usually *requires* the introduction of extrinsic evidence, because a substantive mistake and the original agreement between the parties would rarely be readily apparent based on the terms of the contract itself." *Id.* at 409. And, the Court must resolve the MetLife Defendants' reformation claim *before* addressing the terms of the Erroneous UQA and the Certificate. *See id.* ("Because resolving the mutual mistake could expunge the endorsement provision from the policy, the court should have resolved the allegations of mutual mistake before interpreting the terms of the contract.").

Second, reformation is appropriate even though MTLIC presumably knew, at the time its representative signed the Erroneous UQA and the Certificate was put into place, that those documents provide for the payment of monthly benefits starting at $1,929.43 for the Annuitant's lifetime. As one court observed: "The fact that the written agreement is couched in unambiguous language, or that the parties knew what words were used and were aware of their ordinary meaning, or that they were negligent in failing to observe the mistake before signing the instrument, will not preclude relief by reformation." *Brinker*, 610 S.W.2d at 166. Reformation is thus appropriate even where, as here, the party seeking that relief was arguably negligent in allowing the erroneous document to be put into existence. *See New Braunfels Factory Outlet Center, Inc. v. IHOP Realty Corp.*, 872 S.W.2d 303, 307 (Tex. App.--Austin 1994, no writ) (observing that "any negligence on the part of [the plaintiff] in failing to observe the different wording in the restrictive covenant before signing it does not preclude reformation").[25]

Third, reformation is appropriate even though Hinojosa was purportedly desirous of

---

mutual mistake of the parties").

[25] Numerous other courts have reached the same conclusion. *See, e.g., Hamberlin*, 770 S.W.2d at 14 (noting that "the fact that the reformation claimant's negligence contributed to the mistake or that he had access to knowledge equal to that of the other party will not preclude reformation when to deny it would permit him to suffer a wrong at the hands of the other party"); *Sterling*, 502 S.W.2d at 940 (observing that "negligence of the complaining party where there is mutual mistake or fraud on the part of the other party will not preclude reformation").

obtaining lifetime benefits.  Hinojosa was represented in the Underlying Action by Ferguson, who accepted the 20-Year Certain Quote on her behalf.  Any testimony from Hinojosa as to her subjective desires cannot serve to vary the contemporaneous documents establishing that monthly benefits were to be payable for only 20 years.  *See Thalman*, 635 S.W.2d at 414 ("We hold the evidence that the parties had an option on the amount of minerals to be conveyed is so weak, when compared with the overt actions and admissions of the parties, as to do no more than create a mere surmise of its existence and is, in legal effect, no evidence.").

As Richmond unambiguously testified, either she or someone else at Tailored Awards prepared the Erroneous UQA in error:

> Q.      So all of that being said, is there any doubt in your mind based on the documents you have seen today that the Addendum No. 1 on the Revised Uniform Qualified Assignment was prepared by you or somebody at Tailored Awards?
>
> A.      There is no doubt in my mind based on these documents.
>
> Q.      And is there also no doubt in your mind that that Addendum No. 1 was prepared in error?
>
> MR. HILLIN: Objection, form.
>
> A.      There's no doubt in my mind it was prepared in error, according to these.
>
> Q.      (BY MR. WHITAKER) *There's no doubt in your mind that that is -- that the monthly benefit schedule set forth on the revised Addendum No. 1 is a mistake.*
>
> A.      *It is a mistake.*
>
> MR. HILLIN: Objection, form.

(App. 184.)  Since the Erroneous UQA and the Certificate do not reflect the parties' agreement, they must be reformed to provide, consistent with the 20-Year Certain Quote, the Settlement Agreement, the Judgment, the Application, and the Original UQA, for the payment of $1,929.43 per month, with 3% annual increases, for only 20 years.

**B.     The MetLife Defendants Are Entitled to Summary
Judgment on Hinojosa's Claim for Breach of Contract.**

In turn, the MetLife Defendants are entitled to summary judgment on Hinojosa's claim

for breach of contract (Count 1) for a variety of reasons.  To prevail on this claim, Hinojosa must

establish that the parties had a written agreement that the MetLife Defendants breached, resulting

in damages.  *See Bridgmon v. Array Systems Corp.*, 325 F.3d 572, 577 (5th Cir. 2003) (noting

that the elements of a breach-of-contract claim are "(1) the existence of a valid contract; (2) that

the plaintiff performed or tendered performance; (3) that the defendant breached the contract;

and (4) that the plaintiff was damaged as a result of the breach").

In the Complaint, Hinojosa alleges that "Defendants have breached the contract by failing

and refusing to make monthly payments as required by the Settlement Agreement and Release,

Judgment of the Court, UQA and Certificate for the use and benefit of Hector Jilpas."

(Complaint, ¶ 5.3.)  For the reasons set forth above, however, neither the Settlement Agreement

nor the Judgment, properly read, call for the payment of monthly benefits, starting at $1,929.43

per month, for the Annuitant's life, and the Erroneous UQA and the Certificate must be reformed

to provide for the payment of monthly benefits at that level for only 20 years.  Since the MetLife

Defendants have complied with their payment obligations, Hinojosa's breach-of-contract claim

fails as a matter of law.

Independent of the foregoing, this claim fails because Hinojosa is not a party to a contract

with any of the MetLife Defendants.  After all, the MetLife Defendants are not parties to (or

signatories of) either the Settlement Agreement or the Judgment and thus cannot be liable for any

alleged breach of those documents.  *See, e.g.*, *Griggs v. State Farm Lloyds*, 181 F.3d 694, 700

(5th Cir. 1999) (finding "no basis" for the plaintiff's claim that the defendant breached a contract

to which he was not a party).  Similarly, Hinojosa is not a party to either the Erroneous UQA or

the Certificate; rather, the JUA and MTLIC are the parties to the Erroneous UQA, and the only parties to the Certificate are MTLIC (as the owner) and MetLife (as the issuer).[26]  Since Hinojosa is not a party to either the Erroneous UQA or the Certificate, she lacks standing to sue for the breach of them.  *See Settlement Funding, LLC v. Transamerica Occidental Life Ins. Co.*, 555 F.3d 422, 425 (5th Cir. 2009) (noting that an annuitant is not a party to and "has no rights under" an annuity contract issued in connection with a structured settlement).

Further support for the lack of merit in Hinojosa's breach-of-contract claim may be found in Texas law on assignments.  As a general rule, an assignee stands in the shoes of its assignor and thus assumes only the assignor's liabilities under the contract at issue.  *See Southwestern Bell Tel. Co. v. Marketing on Hold Inc.*, 308 S.W.3d 909, 920 (Tex. 2010) (stating that "an assignee under Texas common law stands in the shoes of his assignor"); *see also Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 729 (5th Cir. 2010) (noting that "an assignee takes all of the rights of the assignor, no greater and no less," and that "an assignee stands in the same position as its assignor stood"); *Schultz v. Weaver*, 780 S.W.2d 323, 325 (Tex. App.--Austin 1989, no writ) (observing that "the assuming party is liable to the same extent as the party from which it assumed the contract").  The assignment does not impact the underlying contract rights; rather, it merely changes the identity of the party responsible for performing the enumerated obligations.  *See Capitan Enterprises, Inc. v. Jackson*, 903 S.W.2d 772, 776 (Tex. App.--El Paso 1994, writ denied) (observing that "an assignment is intended to change only *who* performs an obligation, not the obligation to be performed" (emphasis in original)).

Here, the Erroneous UQA, which is one of the two documents relied upon by Hinojosa in support of her claim for lifetime monthly benefits, actually serves to establish that MetLife's

---

[26] The Settlement Agreement provides that MTLIC "shall be the sole owner of the annuity policy and shall have all rights of ownership."  (App. 062; *see also* Complaint, ¶ 4.2 (acknowledging that MTLIC is "the owner of the annuity contract").)

payment obligations cannot be greater than the obligations Dr. Caballero and the JUA agreed to assume in the Settlement Agreement:

> NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the parties agree as follows:
>
> 1.     The Assignor hereby assigns and the Assignee hereby assumes *all of the Assignor's liability* to make the Periodic Payments….
>
>                               * * *
>
> 3.     *The Assignee's liability to make the Periodic Payments is no greater than that of the Assignor immediately preceding this Agreement*….

(App. 115.)

As such, notwithstanding the terms of Addendum No. 1 to the Erroneous UQA, MetLife is not liable for lifetime monthly payments because Dr. Caballero and the JUA were not liable for such payments. *See Jackson*, 903 S.W.2d at 776 (observing that the rights of the other party to the original contract "are neither enhanced nor diminished by the assignment"); *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 795 (S.D. Tex. 2010) (noting that "[s]ettled law confirms that contractual rights may not expand following an assignment").

All told, summary judgment is appropriate on Hinojosa's breach-of-contract claim.

## C.     The MetLife Defendants Are Entitled to Summary Judgment on Hinojosa's Fraud Claim.

In turn, Hinojosa's fraud claim fails as well. To prevail on this claim, Hinojosa must prove that (1) the MetLife Defendants made a false representation as to a past or existing fact, (2) which was material to the transaction, (3) the MetLife Defendants knew the representation to be false, (4) and made the representation for the purpose of inducing Hinojosa to take certain action, (5) Hinojosa reasonably relied upon the representation, (6) to her detriment. *See Kansa Reinsurance Co. v. Congressional Mortg. Corp. of Texas*, 20 F.3d 1362, 1375 (5th Cir. 1994); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990), *cert. denied*, 498 U.S. 1048

(1991).

Here, Hinojosa contends that MetLife Connecticut committed fraud by informing her by telephone and in its letter dated July 26, 2012 (App. 122) that benefits were not payable for the Annuitant's lifetime.[27]  (Complaint, ¶ 6.2.)  Of course, for the reasons set forth above, the Court should reform the Erroneous UQA and the Certificate to provide that monthly benefits were payable to Hinojosa for only 20 years, meaning that all of the statements in this letter are entirely accurate.  *See McCarty v. Montgomery*, 290 S.W.3d 525, 539 (Tex. App.--Eastland 2009, pet. denied) ("Because we have found that [the plaintiff] was entitled to specific performance, any representation about its ability to proceed to closing was, in fact, true.").  In the absence of a misrepresentation, Hinojosa cannot recover for fraud.  *See Best Auto v. Autohaus, LLC*, 339 S.W.3d 372, 375-376 (Tex. App.--Dallas 2011, no pet.) (entering summary judgment on the plaintiff's fraud and DTPA claims where there was no evidence that the defendant had made a false representation).

In addition, even if this letter is found to contain a misrepresentation, Hinojosa's fraud claim nonetheless fails because she cannot establish the other elements as a matter of law.  For example, Hinojosa agreed in early 1992 to enter into the structured settlement, and a letter from MetLife Connecticut over 20 years later could not be "material to the transaction."  *See Farnham v. Electrolux Home Care Products, Ltd.*, 527 F. Supp. 2d 584, 589 (W.D. Tex. 2007) ("Representations are material if a plaintiff would not have entered into the transaction but for the representations.").  Since Hinojosa was not entering into any sort of transaction with the MetLife Defendants at the time, any alleged misrepresentations in this letter were not material to any transaction between them.

---

[27] MetLife Connecticut did not have any involvement with the Certificate, which was owned by MTLIC and issued by MetLife, and this letter was apparently placed on the letterhead of MetLife Connecticut in error.

In turn, Hinojosa cannot establish that MetLife Connecticut knew the representation to be false.  Rather, as detailed above, the statements in the letter of which Hinojosa is complaining are entirely consistent with the payment streams in the 20-Year Certain Quote, the Application, the Settlement Agreement, the Judgment, and the Original UQA and thus conclusively disprove any claim that MetLife Connecticut knew that the statements in its letter were false.

Similarly, MetLife Connecticut did not send this letter for the purpose of inducing Hinojosa to take certain action; rather, it was informing her that, according to MetLife's records, MetLife had paid all of the monthly benefits that were payable under the annuity it had been asked, had agreed, and was paid to issue.  Finally, Hinojosa cannot claim she reasonably relied on this letter to her detriment; to the contrary, she apparently believed at the time that this letter falsely stated she was not entitled to any additional monthly benefits from MetLife.  *See JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 408 (Tex. App.--Houston [1st Dist.] 2011, pet. denied) ("For purposes of a fraud claim, a party cannot justifiably rely on a representation when that party has actual knowledge before its reliance of that representation's falsity.").  And, since this letter merely informed Hinojosa that she was not entitled to any additional monthly benefits, there is no evidence that she suffered any damages as a result of it.

All told, summary judgment is appropriate on Hinojosa's fraud claim.

**D.     The MetLife Defendants Are Entitled to Summary Judgment on Hinojosa's Claims for Bad Faith and Violations of the Texas Insurance Code and DTPA.**

Finally, summary judgment is appropriate on Hinojosa's claims for bad faith and alleged violations of the Texas Insurance Code and the DTPA.  To prevail on these claims, Hinojosa must establish that the MetLife Defendants knew or should have known it was reasonably clear that MetLife was obligated to pay monthly benefits, starting at $1,929.43 per month, for the Annuitant's life.  *See Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997); *see also*

*Provident American Ins. Co. v. Castaneda*, 988 S.W.2d 189, 196 (Tex. 1998) (observing that bad faith focuses not on the validity of the claim, but on the reasonableness of the defendant's conduct in rejecting it).  If a defendant has a reasonable basis for denying payment, it cannot be guilty of bad faith as a matter of law.  *Lyons v. Millers Cas. Ins. Co. of Texas*, 866 S.W.2d 597, 601 (Tex. 1993); *see also Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997) (holding that the insurer had a reasonable basis to dispute the validity of the insured's claim and thus did not act in bad faith as a matter of law).

As detailed above, the MetLife Defendants indisputably had a reasonable basis for determining that Hinojosa is not entitled to additional monthly benefits from MetLife.  That is, the 20-Year Certain Quote, the Settlement Agreement, the Judgment, the Application, and the Original UQA uniformly indicated that MetLife was being asked to pay monthly benefits, starting at $1,929.43 per month and with 3% annual increases, for only 20 years.  MetLife had also announced, through the Lifetime Quote, that it would pay monthly benefits, starting at $1,096.94 per month and with 3% annual increases, for at least 20 years and continuing for the Annuitant's life.  MetLife never agreed, however, to pay benefits for the Annuitant's life starting at $1,929.43 per month.  So, even if the Court were to find that MetLife is obligated to pay lifetime monthly benefits, the analysis set forth above establishes that its position is at least reasonable and does not constitute bad faith or a statutory violation.  *See McIntyre v. Armed Forces Benefit Ass'n*, 27 S.W.3d 85, 92 (Tex. App.--San Antonio, no pet.) (noting that "an insurer who proves it had a reasonable basis for denying a claim, even if the finder eventually determines that basis to be erroneous, enjoys immunity from statutory bad faith under the Texas Insurance Code and the Texas Deceptive Trade Practices Act").

Independent of the foregoing, Hinojosa's bad faith and statutory claims fail because, once

the Erroneous UQA and the Certificate are reformed to reflect the parties' original agreement, the MetLife Defendants are not in breach of any of their obligations, which breach is a prerequisite to recovery for bad faith and statutory violations.  *See Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995) ("As a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered."); *McLaren v. Imperial Cas. & Indem. Co.*, 767 F. Supp. 1364, 1377 (N.D. Tex. 1991) (holding that "prolix" claims for coverage by estoppel, bad faith, statutory violations, and breach of warranty did not survive summary judgment where the policy terms barred the plaintiff's claims for benefits), *aff'd*, 968 F.2d 17 (5th Cir. 1992), *cert. denied*, 507 U.S. 915 (1993).[28]

Finally, Hinojosa cannot recover from the MetLife Defendants under either the Texas Insurance Code or the DTPA, as those statutes are inapplicable here.  For example, Hinojosa's reliance on the Texas Insurance Code (Complaint, ¶¶ 7.2-7.5) fails because none of the documents on which she purports to base her claims qualifies as "an insurance policy," as required by Tex. Ins. Code § 541.061, and the activities of the MetLife Defendants do not involve "the business of insurance," as required by Tex. Ins. Code § 541.001.  In turn, Hinojosa cannot recover under the DTPA because, by her own admission (Complaint, ¶ 8.2), her DTPA claims are predicated, in their entirety, on her meritless Texas Insurance Code claims.  Moreover, Hinojosa does not qualify as a "consumer" under Tex. Bus. & Com. Code § 17.45(4), as she did not seek or acquire, by purchase or lease, any goods or services from any of the MetLife Defendants.  *See* Complaint, ¶ 4.2 (noting that the funding of the assignment from the JUA to MTLIC "was done entirely between" those two entities).  And, any complaints regarding the

---

[28] Numerous other courts have reached the same conclusion.  *See, e.g.*, *Koral Indus. v. Security-Connecticut Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990) (per curiam) (showing of defense to payment of benefits under policy negated alleged statutory violations); *Bartlett v. American Republic Ins. Co.*, 845 S.W.2d 342, 348 (Tex. App.--Dallas 1992, no writ) (same).

letter dated July 26, 2012 from MetLife Connecticut (App. 122) cannot constitute a statutory violation.  *See Avila v. Loya*, No. 07-04-0096-CV, 2005 WL 1902120, at \*5 (Tex. App.-- Amarillo Aug. 10, 2005, no pet.) (noting that "post-loss misrepresentations are not misrepresentations of the type that give rise to DTPA § 17.46 actions").

The Court should thus enter summary judgment in the MetLife Defendants' favor on Hinojosa's claims for bad faith and alleged violations of the Texas Insurance Code and the DTPA.

**E.    The MetLife Defendants Are Entitled to Summary Judgment on Hinojosa's Claim for Future Benefits.**

Moreover, Hinojosa cannot recover future benefits at trial, as the MetLife Defendants have not committed an anticipatory breach of the Certificate.  In his letter dated December 9, 2013, Hillin asserted that Hinojosa can recover, in a lump sum at trial, an additional 50 years of monthly benefits, the present value of which totals (by his calculation) $1,033,302.02.  (App. 153.)  In the Complaint, Hinojosa seeks (among other relief) "past and future consequential damages" allegedly resulting from MetLife's decision to stop paying monthly benefits to her.  (Complaint, ¶ 11.1.)

This damage model, however, incorrectly assumes that MetLife has committed an anticipatory breach of contract, which has not occurred here.  First, MetLife paid monthly benefits under the Certificate for 20 years and will be paying the $40,000.00 lump-sum payment due on March 13, 2017, and those payments are fatal, as a matter of law, to any anticipatory breach claim.  *See, e.g.*, *Townewest Homeowners Ass'n, Inc. v. Warner Communication Inc.*, 826 S.W.2d 638, 640 (Tex. App.--Houston [14th Dist.] 1992, no writ) (refusing to find an anticipatory breach of contract where the defendants had complied with the terms of the contracts at issue for several years); *McKenzie v. Farr*, 541 S.W.2d 879, 882 (Tex. Civ. App.--

Beaumont 1976, writ ref'd n.r.e.) (noting that "it is the rule that refusal by one party to perform an independent provision of a divisible contract is not such renunciation or abandonment as will support an action under the principles of anticipatory breach of the whole agreement"). Second, it appears that Hinojosa and MetLife have a good-faith dispute over the Certificate's terms, which MetLife believes should be reformed to reflect the true facts, and this dispute does not constitute an anticipatory breach. *See Dupree v. Gulf Oil Corp.*, 328 F. Supp. 480, 483 (E.D. Tex. 1971) (observing that "it is well settled that a refusal to perform arising from a bona fide controversy over the terms of a contract, or the construction to be placed upon it, may be sufficient to constitute breach of contract, but the same does not amount to such a repudiation as to constitute an anticipatory breach").

Consequently, Hinojosa cannot recover future benefits at trial; rather, any recovery on her breach-of-contract claim should be limited to the unpaid benefits *through the date of trial*. *See, e.g.*, *Aetna Life Ins. Co. v. Swain*, 148 S.W.2d 921, 923 (Tex. Civ. App.--Galveston 1941, no writ) (observing that "a refusal of the appellant to pay the first, or any succeeding installment, even if indisputably made, did not authorize the acceleration of the other payments, and permit recovery of them all at once in a lump sum").

## CONCLUSION

At the end of the day, the 20-Year Certain Quote, the Settlement Agreement, the Judgment, the Application, and the Original UQA uniformly establish that MetLife was requested to issue, agreed to issue, and was paid to issue an annuity providing monthly benefits starting at $1,929.43 per month, with 3% annual increases, for only 20 years. Due to the scrivener's error made by Richmond, however, the Erroneous UQA and the Certificate mistakenly provided for the payment of monthly benefits, starting at that level, for the entirety of

the Annuitant's life.  Since MetLife has now paid all of the monthly benefits that it was asked to issue, agreed to issue, and was paid to issue, it is entitled to summary judgment on its counterclaims for reformation and declaratory relief and all of Hinojosa's claims.

Respectfully submitted,

FIGARI & DAVENPORT, L.L.P.

By:    /s/ Andrew C. Whitaker
   Andrew C. Whitaker
   State Bar No. 21273600
   andrew.whitaker@figdav.com

3400 Bank of America Plaza
901 Main Street
Dallas, Texas  75202
(214) 939-2000
(214) 939-2090 (telecopy)

R. Patrick Rodriguez
State Bar No. 24002861
ATLAS, HALL & RODRIGUEZ, L.L.P.
50 W. Morrison Road, Suite A
Brownsville, Texas 78520
(956) 574-9333
(956) 574-9337 (telecopy)
prodriguez@atlashall.com

ATTORNEYS FOR DEFENDANTS
METROPOLITAN LIFE INSURANCE
COMPANY, METROPOLITAN TOWER LIFE
INSURANCE COMPANY, METROPOLITAN
INSURANCE AND ANNUITY COMPANY,
AND METLIFE INSURANCE COMPANY OF
CONNECTICUT

## CERTIFICATE OF SERVICE

   I hereby certify that on February 12, 2015, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants: Mr. Hunter Hillin, Hillin Law, 11701 Bee Cave Road, Suite 218, Austin, Texas 78738.

     /s/ Andrew C. Whitaker
     Andrew C. Whitaker